1
2
3
4
5
6
7
8                         UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10

11   TRINIDAD LOPEZ, ET AL.,                    Case No.  CV 14-05576-AB (JCx)

12                   Plaintiffs,
                                                **ORDER GRANTING IN PART**
13   v.                                         **PLAINTIFFS' MOTION FOR CLASS**
                                                **CERTIFICATION [170] AND**
14   LIBERTY MUTUAL INSURANCE                   **DENYING MOTIONS TO STRIKE**
     CO, ET AL.,                                **[260, 291, 292]**
15
                     Defendants.
16

17

18        Before the Court is Plaintiffs Trinidad Lopez and Marisela Beas's (collectively,

19   "Plaintiffs") Motion for Class Certification.  (Dkt. No. 170.)  Defendants Liberty

20   Mutual Insurance Company, Golden Eagle Insurance Corporation, and Safeco

21   Insurance Company of America (collectively, "Defendants") filed an opposition, (Dkt.

22   No. 252), and Plaintiffs replied, (Dkt. No. 285).  Both sides filed thousands of pages

23   of declarations and exhibits to support their respective positions.  Additionally,

24   Defendants filed a motion to strike the expert report of Plaintiffs' expert Jon A.

25   Krosnick, (Dkt. No. 260), and Plaintiffs filed motions to strike the expert reports of

26   Defendants' experts Elaine Reardon and Ronald T. Wilcox, (Dkt. Nos. 291, 292).  The

27   Court held a hearing on the Motions on September 14, 2018, and took the matters

28   under submission.  Having carefully reviewed the parties' submissions and considered

the arguments presented during oral argument, and for the reasons indicated below, the Court **GRANTS in part** Plaintiffs' Motion for Class Certification.  The Court **DENIES** Defendants' Motion to Strike and **DENIES** Plaintiffs' Motions to Strike.

## I.    BACKGROUND

The facts underlying this case are familiar to the parties and the Court. Accordingly, only a brief summary of the relevant facts is provided here.  Plaintiffs seek class certification on behalf of current, former, and future employees of Defendants.  The putative class consists of California-based, non-management claims handlers, including special investigative unit ("SIU") investigators.  (Dkt. No. 170 ("Class Cert. Mot.") at 1.)  Plaintiffs allege Defendants unlawfully denied class members overtime compensation and meal and rest breaks in violation of various provisions of the California Labor Code, Wage Orders, and other provisions of California law.  (*Id.*)  Excluded from this putative class are "Fast Path Property Loss Specialists" who were classified as nonexempt and employees who were members of the putative class in *Braun v. Safeco*, Case No. 2:13-CV-00607 (C.D. Cal. Jan. 28, 2013) ("*Braun*"), "but only for those periods that each such employee worked for the Safeco claims department.  (Dkt. No. 248, Fifth Amended Complaint ("Compl.") ¶ 79.)

Plaintiffs seek certification under Federal Rule of Civil Procedure 23(b)(3) and contend common questions predominate based on the following: (1) class members underwent periodic training regardless of experience level; (2) class members had one set of common manuals; (3) class members were subject to common levels of supervision; and, (4) class members performed a finite list of tasks.  (*Id.* at 12.)

## II.    LEGAL STANDARD

### a.  Class Certification

Class actions are governed by Federal Rule of Civil Procedure ("Rule") 23 of the Federal Rules of Civil Procedure.  In discussing Rule 23, the Supreme Court has

held that it "does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("*Dukes*").  To obtain class certification, plaintiffs bear the burden of showing that they have met each of the four requirements of Rule 23(a) and at least one subsection of Rule 23(b).  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, *amended by* 273 F.3d 1266 (9th Cir. 2001).  "A party seeking class certification must affirmatively demonstrate . . . compliance with the Rule[.]" *Dukes*, 564 U.S. at 350.

Under Rule 23(a), a district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  That is, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to be certified.  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

If all four prerequisites of Rule 23(a) are satisfied, the Court must also find that the plaintiff "satisf[ies] through evidentiary proof" at least one of the three subsections of Rule 23(b).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Rule 23(b) sets forth three general types of class actions.  *See* Fed. R. Civ. P. 23(b)(1)–(3).  Here, Plaintiffs seek certification under Rule 23(b)(3).  The Court can certify a class under Rule 23(b)(3) if it finds that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and effectively adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim[.]" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Dukes*, 564 U.S.

3.

at 351); *see also Mazza*, 666 F.3d at 588 ("Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23." (quoting *Zinser*, 253 F.3d at 1186)). This "rigorous" analysis applies to both Rule 23(a) and Rule 23(b). *Comcast Corp.*, 569 U.S. at 34 (stating that Congress included "addition[al] . . . procedural safeguards for (b)(3) class members beyond those provided for (b)(1) or (b)(2) class members (e.g., an opportunity to opt out)" and that a court has a "duty to take a 'close look' at whether common questions predominate over individual ones").

Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen, Inc.*, 568 U.S. at 464–66. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 466. If a court concludes that the moving party has met its burden of proof, then the court has broad discretion to certify the class. *Zinser*, 253 F.3d at 1186.

### b. Admissibility of Expert Opinions, Reports, and Surveys

Expert witnesses are governed by Rules 702 to 705 of the Federal Rules of Evidence. Under Federal Rule of Evidence 702, expert testimony is allowed only if the "expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; the testimony is based on sufficient facts or data; the testimony is the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The Supreme Court has identified four factors that "may" bear on such an analysis, including: (1) whether the theory can be and has been tested; (2) whether the theory has been peer reviewed and published; (3) what the theory's known or potential error rate is; and (4) whether the theory enjoys general acceptance in the applicable scientific community. *Daubert v. Merrell Dow Pharm.*,

*Inc.*, 509 U.S. 579, 592–93 (1993).

"The duty falls squarely upon the district court to 'act as a gatekeeper to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards.'" *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)). However, this duty "is to evaluate the soundness of the expert's methodology, not the correctness of the expert's conclusions." *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, No. 17-cv-00564 NC, 2018 WL 3126385, at *2 (N.D. Cal. June 26, 2018) (citing *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)). Moreover, the inquiry into admissibility of expert opinion is a "flexible one," where "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564 (citing *Daubert*, 509 U.S. at 594, 596). In other words, "[t]he Court has broad discretion and flexibility in assessing an expert's reliability." *Fitzhenry-Russell*, 2018 WL 3126385, at *2 (citing *Estate of Barabin*, 740 F.3d at 463).

Similarly, when considering a survey's admissibility, courts looks first to Federal Rule of Evidence 702 and *Daubert*. *See Ellis*, 657 F.3d at 982 ("*Daubert* does not require a court to admit or exclude evidence based on its persuasiveness; rather it requires a court to admit or exclude evidence based on its scientific reliability and relevance."). Evidence should be excluded as unreliable if it "suffer[s] from serious methodological flaws." *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005)). Further, evidence should be excluded as irrelevant if it does not "fit" the issue to be decided: "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *See Daubert*, 509 U.S. at 591.

The Ninth Circuit has explained that there are two steps in a district court's treatment of a survey. *See Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001). First, the court is to determine admissibility: "is there a proper

foundation for admissibility, and is it relevant and conducted according to accepted principles?" *Id.*  Second, once the survey is admitted, "follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility." *Id.*; *see also Fortune Dynamic*, 618 F.3d at 1036 ("'[T]echnical inadequacies' in a survey, 'including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.'").  On the other hand, "substantial deficiencies in the design or execution of a survey of individuals is grounds for its complete exclusion." *See Gibson v. Cty. of Riverside*, 181 F. Supp. 2d 1057, 1067 (C.D. Cal. 2002); *see also Sirko v. Int'l Bus. Machs. Corp.*, No. CV 13-03192 DMG (SSx), 2014 WL 4452699, at *4 (C.D. Cal. Sept. 3, 2014); *Stonebrae, L.P. v. Toll Bros., Inc.*, No. C-08-0221 EMC, 2011 WL 1334444, at *4 (N.D. Cal. Apr. 7, 2011), *aff'd* 521 Fed. App'x 592 (9th Cir. 2013) (emphasis added) (holding that "so long as the data are reliable, methodological deficiencies" impact weight, not admissibility).

## III.   DISCUSSION

### a.  Motion to Strike Expert Report and Declaration of Jon A. Krosnick

In support of their motion for class certification, Plaintiffs submit the declaration and report of their expert, Jon A. Krosnick.  (Dkt. No. 198, Declaration of Jon A. Krosnick ("Krosnick Decl.").)  Krosnick's report and declaration center on a survey he designed and conducted for this case.  Essentially, Krosnick's declaration explains the survey's purpose and goals, the procedures he adhered to in implementing the survey, and addresses his compliance with Dr. Sheri Diamond's Survey Criteria from the Reference Manual on Scientific Evidence.  (*See id.* ¶¶ 30–71.)  In his report, Krosnick explains his preparation for and execution of the survey in greater detail.  (*Id.* ¶¶ 104–279.)

In an effort to determine whether class members spent over 50% of their time on non-exempt tasks, Krosnick developed a list of tasks and asked class member participants to estimate the percentage of time they spent on each task per week during their employment.  (*See* Krosnick Decl. ¶ 11.)  Krosnick allegedly developed the task list after speaking with class members to learn more about how they thought and spoke about their work experiences.  (*Id.* ¶ 104.)  Krosnick performed additional research, including "pretesting" of his draft questionnaire, to ensure "that the task list used in the survey was comprehensive (contained all work asks done by employees), non-overlapping (i.e., no work task fit more than one category), and understandable to respondents."  (*Id.* ¶ 118.)  Based on the results of survey, Plaintiffs suggest that the trier of fact can decide whether each" task" listed is exempt or non-exempt, and can simply add up class member's stated percentages to determine if they spent over 50% of their time per week on exempt tasks.  In response Defendant argues that the survey is "so fundamentally flawed in its conception, design, and execution" that it—along with the subsequent report—must be excluded.  (Dkt. No. 260 ("Mot. Strike Krosnick Report") at 1.)

Thus, before turning to class certification, the Court considers Defendant's challenges to Professor Krosnick under Federal Rule of Evidence 702 and *Daubert*. *See Cholakyan v. Mercedes–Benz, USA, LLC*, 281 F.R.D. 534, 541 (C.D. Cal. 2012) ("[T]he Ninth Circuit approved the application of *Daubert* to expert testimony presented in support of or opposition to a motion for class certification.") (citing *Ellis*, 657 F.3d at).  "The party offering the expert bears the burden of establishing that Rule 702 is satisfied."  *Cholakyan*, 281 F.R.D. at 543 (quotation omitted).  As interpreted by the *Daubert* Court, there is a two-part inquiry under Rule 702 for determining the admissibility of proffered expert opinion testimony which requires consideration of whether: (1) the reasoning or methodology underlying the testimony is scientifically valid (the reliability prong); and (2) whether that reasoning or methodology properly

can be applied to the facts in issue (the relevancy prong).  *Daubert*, 509 U.S. at 592–93.

Defendants make three main arguments in their motion to strike.  First, Defendants argue that there is no scientific or factual basis to believe that someone can accurately recall the time they spent on a certain task per week for the entire duration of their employment—especially when the "task" list was generated by someone else.  (Mot. Strike Krosnick at 6.)  Defendants contend that "the retrieval of information from long-term memory can lead to errors" especially in this case where respondents allegedly "never would have encoded the requested 'task' information in their memories in the first place."  (*Id.* at 7.)  Further, Defendants argue that Krosnick did nothing to ensure and did not meaningfully test the accuracy of respondents' answers.  (*Id.* at 8–9.)  Second, Defendants argue that the survey respondents were subject to significant bias because "Krosnick made no effort to exclude named Plaintiffs from the focus groups, pretesting or survey," and "80% of respondents recall reading or hearing something about a lawsuit against the Defendants, including allegations of misclassification."  (*Id.* at 11–12.)  Defendants also contend that the survey is subject to substantial non-response bias which Krosnick did not "take meaningful steps to address."  (*Id.* at 15.)  Third, Defendants argue that the "survey design is so complex that it is unlikely to yield reliable results."  (*Id.* at 17.)  For example, Defendants state that respondents had to assign 100 percentage points among a list of 26 or 32 tasks, "a cognitively complex task."  (*Id.*)  Defendants also note that the survey was long, increasing the likelihood of respondent fatigue, (*id.* at 18), and that Krosnick did not randomize the order of questions, increasing the likelihood of order bias, (*id.* at 19).  Finally, Defendants argue that the task descriptions were ambiguous, slanted, and incomplete.  (*Id.* at 21–22.)

The Court initially notes that most of Defendants concerns go to the weight, not the admissibility, of Krosnick's report and opinion.  However, after considering the

report itself as well as the parties other submissions, the Court has reservations about the reliability of Krosnick's survey.  Most concerning is the fact that numerous named Plaintiffs participated in the focus groups and the survey itself.  These individuals clearly knew about the instant litigation and it cannot seriously be argued that their responses were unbiased.  Indeed, 28 of the survey respondents were named Plaintiffs, which amounts to 15% percent of the total respondents.  *See Duran v. U.S. Bank Nat'l Ass'n*, 59 Cal. 4th 1, 43 ("A sample that includes even a small number of interested parties can produce biased results.").  Further, 85% of respondents acknowledged hearing or reading something about a lawsuit against Defendants, including allegations of misclassification and overtime violations.  Even if they did not know about this lawsuit in particular, they could have easily surmised that the survey was related to litigation given their general knowledge of the accusations against Defendants.  Accordingly, a large percentage of the survey responses may have been skewed by respondents' desire to obtain a positive outcome for themselves from litigation.  Further, Krosnick did not record the names of those individuals who participated in the focus groups, which also raises a potential bias issue; these individuals would have been aware of what they were asked during the focus group when they answered the survey, and could have been improperly influenced by their earlier participation.

The Court is also left wondering about the comprehensiveness of the survey's task list.  Krosnick states that he formulated the list after interviewing class members and learning about how they spoke about their jobs.  However, *he* ultimately wrote the descriptions, and since he lacks significant claims handling experience, it is unclear whether the list was truly exhaustive.  For example, Krosnick stated that he "assured" that the task list did not include overlapping tasks, meaning the task did not fit into more than one category.  (Krosnick Decl. ¶ 118.)  However, Defendants raise the issue of where the common task of "setting reserves" can be located.  (*See* Class Cert.

Opp'n at 6; Dkt. No. 268 at 31.)  In their opposition to Defendant's motion to strike, Plaintiffs state that "setting reserves" "incorporates several discrete duties, from interviewing and gathering information to evaluating, analyzing, and planning. Thus, time spent setting reserves is encompassed within different categories of tasks on the task list." (Dkt. No. 301 at 22.)  This raises questions as to whether respondents accurately accounted for their time setting reserves, as they essentially would have had to split up this task into it "discrete parts" as Plaintiffs suggest.  Plaintiffs have also not addressed the argument that each specific task cannot be stripped of its context when determining whether it was exempt or non-exempt—some tasks that may seem routine on their face, such as typing or calendaring, are not categorically exempt if they are directly and closely related to exempt work.  *See* Cal. Admin. Code § 11040(1)(A)(2)(f).  For these reasons, the Court questions whether the survey would actually be helpful to the trier of fact in determining whether a task is non-exempt.

Despite these and other concerns, the Court need not conclude whether Krosnick's declaration, report or the survey is admissible.  At the class certification stage, courts apply a "tailored" *Daubert* analysis to determine the reliability of the expert's testimony regarding the Rule 23 requirements, not the merits of the case.  *See Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 498 (C.D. Cal. 2012); *see also Behrend v. Comcast Corp.*, 655 F.3d 182, 204 n.13 (3d Cir. 2011) ("[A]lthough the Supreme Court recently hinted that *Daubert* may apply for evaluating expert testimony at the class certification stage, it need not turn class certification into a mini-trial.").  The question is whether the expert evidence is sufficiently probative to be useful in evaluating whether class certification requirements have been met.  *See In re Polypropylene Carpet Antitrust Litigation*, 996 F. Supp. 18, 26 (N.D. Ga. 1997) (at class certification stage, court only examined whether the expert's methodology will (a) comport with basic principles, (b) have any probative value, and (c) primarily use evidence that is common to all members of the proposed class).

Here, as discussed below, the Court finds certification proper on grounds that are not dependent on the survey or Krosnick's report.  Accordingly, the Court did not rely on the report in determining whether class certification was proper, and Defendants' motion to strike is **DENIED** as moot.

Similarly, both of Defendants' experts, Dr. Reardon and Dr. Wilcox, submitted reports in response to the survey and/or Krosnick's report.  (*See* Dkt. No. 250-3 at Ex. G ("Wilcox Report") (stating that he was hired to "review and opine on the expert report submitted by Professor Jon Krosnick"); Ex. H ("Reardon Report") (stating that she was "asked to review and comment on the survey that Dr. Jon Krosnick submitted in this matter").  Because the Court did not rely on the survey or Krosnick's report, it also did not rely on the reports in response thereto.  Accordingly, Plaintiffs' motions to strike are also **DENIED** as moot.

### b.  Motion for Class Certification

Pursuant to Rules 23(a) and 23(b)(3), Plaintiffs move to certify a class of "all persons who are, have been, or will be employed during the "Class Period" by Defendants in the State of California, as an exempt non-management claims handler, including SIU investigators" (the "Class").  (Dkt. No. 170, Plaintiffs' Motion for Class Certification ("Class Cert. Mot.") at iii.)  The "Class Period" spans from April 24, 2010 through the final disposition of this action.  (*Id.*; *see also* Dkt. No. 248, Consolidated Class Action Complaint ("CAC") at 4.)  The proposed Class specifically excludes certain individuals, including (1) Fast Path Property Loss Specialists who were classified as nonexempt, (2) employees who were part of the *Braun* litigation but only for the periods that such employees worked for the Safeco claims department, (3) members of the class that settled in the *Harris* litigation who did *not* continue working for Defendants in exempt positions within the Class definition during the Class period.  (Class Cert. Mot. at iii.)  Plaintiffs also seek to certify a subclass of "[a]ll Class Members who are former employees of Defendants and, having not received all wages

due to them upon resignation or termination within the period prescribed under California law, are eligible for waiting time penalties" (the "Subclass").  (*Id.* at iv.)

All of Plaintiffs' causes of action rely on the same theory of liability: Defendants misclassified non-management claims handlers and SIU investigators (the "Class Members") as exempt under the California Labor code, and as a result, Class Members were not paid overtime, provided with accurate wage statements, provided meal or rest breaks, or paid on time.  (*See generally* CAC claims 1, 2, 3, 4, 5.)

California requires employers pay overtime premiums, provide meal breaks, and provide accurate itemized wage statements.  See Cal. Lab. Code §§ 510, 512, 226, 226.7.  However, California Labor Code section 515 provides that the Industrial Welfare Commission ("IWC") may establish exemptions from these requirements. Pursuant to section 515, the IWC has promulgated exemptions for professional and administrative employees.  *See* California Wage Order 4–2001, codified at 8 Cal. Code. Regs. tit. 8, § 11040 ("Wage Order 4").  "An employer who claims an exemption from the California Labor Code's overtime provisions has the burden of showing that the exemption applies."  *Rieve v. Coventry Health Care, Inc.*, 870 F. Supp. 2d 856, 876 (C.D. Cal. 2012).  Defendants assert that Plaintiffs and the putative class qualify as exempt from overtime pay under the administrative exemption because they are "engaged in duties such as investigating claims, evaluating coverage, setting reserves, creating plans, negotiating settlements, and managing litigation." (Dkt. No. 252 ("Class Cert. Opp'n") at 3.)  But, Defendants main argument is that the determination as to whether an individual is properly classified as exempt is not a proper determination that can be made on a class-wide basis; Defendants suggest that "the exemption inquiry is fact specific and depends on each employee's actual mix of duties."  (*Id.* (citing *Braun v. Safeco Ins. Co. of Am.*, No. CV 13–00607 BRO (PLAx), 2014 WL 9883831, at *9 (C.D. Cal. Nov. 7, 2014).)

Pursuant to Wage Order 4, a person qualifies for the administrative exemption if her duties and responsibilities involve "the performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his employer's customers" and:

> (b) Who customarily and regularly exercises discretion and independent judgment; and
>
> (c) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity . . . ; or
>
> (d) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge; or
>
> (e) Who executes under only general supervision special assignments and tasks; and
>
> (f) Who is primarily engaged in duties that meet the test of the exemption.

Cal. Code Regs. tit. 8, § 11040(1)(A)(2)(a)–(f).

Plaintiffs argue that the administrative exception does not apply because very few of the tasks regularly performed by Class Members are important administrative duties, they are not performed "under only general supervision," and in performing such duties, Class Members do not exercise meaningful "discretion and independent judgment." (Class Cert. Mot. at 1–3.)

## 1. Ascertainability

Under Rule 23, "[a] class definition should be precise, objective and presently ascertainable," such that it is "administratively feasible to determine whether a particular person is a class member." *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 658 (C.D. Cal. 2014) (citations and internal quotation marks omitted). "The identity of class members need not, however, be known at the time of class certification." *Id.* Here, Plaintiffs have defined the class based on objective criteria, specifically that each class member was employed in California by Defendants as an exempt non-

13.

management claims handler or SIU investigator during the class period.  (*See* Class Cert. Mot. at iii; CAC ¶ 79.)  Defendants were able to ascertain the class from their employment records, and have identified the "type of claim most class members handled as well as the dates that they were in each position."  (Class Cert. Mot. at 8.)  Moreover, Defendants do not argue that the proposed Class or subclass is unascertainable.  *See City of Huntington Park v. Landscape Structures*, No. EDCV 14-00419-VAP (DTBx), 2015 WL 3948411, at *4 (C.D. Cal. June 27, 2015).  Accordingly, the Court finds that the proposed Class is ascertainable.

### 2.  Rule 23(a) Factors

### A.  Numerosity

Under Rule 23(a)(1), a class must be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  "'[I]mpracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class."  *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964).  "Although there is no exact number," courts have repeatedly held that classes comprised of "more than forty" members presumptively satisfy the numerosity requirement.  *See e.g.*, *DuFour v. BE LLC*, 291 F.R.D. 413, 417 (N.D. Cal. 2013) (citing *Krzesniak v. Cendant Corp.*, No. 05-05156 MEJ, 2007 WL 1795703, at *7 (N.D. Cal. June 20, 2007)).  "Where the exact size of the proposed class is unknown, but general knowledge and common sense indicate it is large, the numerosity requirement is satisfied."  *Heffelfinger v. Elec. Data Sys. Corp.*, No. CV 07-00101 MMM (Ex), 2008 WL 8128621, at *13 (C.D. Cal. Jan. 7, 2008) (citations and internal quotation marks omitted).

Plaintiffs propose a class of 773 current and former California employees in the job positions at issue.  (Class Cert. Mot. at 9; Dkt. No. 171, Declaration of Alan Shenoi ("Shenoi Decl. I") ¶ 15; *cf.* Class Cert. Opp'n at 4 (asserting that the class consists of over 800 employees).)  Defendants do not specifically contest numerosity.

1  Regardless, a class of this size is sufficient to make joinder of all class members'

2  claims impracticable.  Accordingly, Plaintiffs have satisfied the numerosity

3  requirement.

## B. Commonality

5  Courts have construed Rule 23(a)(2)'s commonality requirement permissively.

6  *See Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003).  "All questions of fact

7  and law need not be common to satisfy the rule.  The existence of shared legal issues

8  with divergent factual predicates is sufficient, as is a common core of salient facts

9  coupled with disparate legal remedies within the class."  *Jimenez v. Allstate Ins. Co.*,

10  765 F.3d 1161, 1165 (9th Cir. 2014) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d

11  1011, 1019 (9th Cir. 1998)).  Nevertheless, "[c]ommonality requires the plaintiff to

12  demonstrate that the class members 'have suffered the same injury,'" which "does not

13  mean merely that they have all suffered a violation of the same provision of law."

14  *Dukes*, 564 U.S. at 350 (citation omitted).  The "claims must depend on a common

15  contention" and "[t]hat common contention . . . must be of such a nature that it is

16  capable of classwide resolution—which means that determination of its truth or falsity

17  will resolve an issue that is central to the validity of each one of the claims in one

18  stroke."  *Id.*  The common question or questions must also be "apt to drive the

19  resolution of the litigation," which turns on the nature of the underlying legal claims

20  in the case.  *Jimenez*, 765 F.3d at 1165 (quoting *Abdullah v. U.S. Sec. Associates, Inc.*,

21  731 F.3d 952, 962 (9th Cir. 2013)).  Thus commonality requires an understanding of

22  the nature of the underlying claims.  *Id.* (citing *Parsons v. Ryan*, 754 F.3d 657, 676

23  (9th Cir. 2014)).

24  As mentioned, the merits inquiry for the majority of the claims in this action

25  turns on whether it was proper for Defendants to uniformly classify all Class Members

26  as exempt under the administrative exemption.  For this inquiry, Plaintiffs point to

27  various legal questions common to all Class Members: whether Defendants can meet

28

their burden of demonstrating that the work primarily performed by Class Members is "directly related to [Defendants'] management policies or general business operations," is performed "under only direct supervision," and that in performing such tasks, Class Members exercise "discretion and independent judgment." *See* Wage Order 4.  (*See also* Class Cert. Mot at 1–5.)  Accordingly, Plaintiffs' theory of the case presents several common questions, the resolution of which will resolve issues central to the validity of Plaintiffs' claims.  *See Casida v. Sears Holding Corp.*, No. 1:11–cv–01052 AWI JLT, 2012 WL 3260423, at *11–12 (E.D. Cal. Aug. 8, 2012) (finding commonality satisfied where plaintiffs sought certification based on "a corporate blanket exemption policy" and alleged uniform employment practices); *Gales v. Winco Foods*, No. C 09-05813 CRB, 2011 U.S. Dist. LEXIS 96125, 2011 WL 3794887, at *2 (N.D. Cal. Aug. 26, 2011) (finding policy of classifying all employees as exempt met commonality requirement because the "theory of the case presents several common questions, such as whether WinCo's classification was correct, whether it was done knowingly, whether all class members share similar job duties, and the proper categorization of those duties as exempt or not-exempt"); *Krzesniak v. Cendant Corp.*, No. C 05–05156 MEJ, 2007 WL 1795703, at *7 (N.D. Cal. June 20, 2007) (noting that "[j]udges from this district—in recent exempt/non-exempt classification cases involving store manager claims under California law for unpaid overtime and mean [sic] and rest period violations—have found sufficient commonality when" similar issues are presented).  For these reasons, the Court finds Plaintiffs have also satisfied the commonality requirement.

### C. Typicality

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class."  *Wolin v. Jaguar Land Rover North Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010).  "The test of typicality 'is whether other members have the same or similar injury, whether the action is based

on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Ellis*, 657 F.3d at 984 (quoting *Hanon*, 976 F.2d at 508).  Thus typicality is generally satisfied if the plaintiffs' claims are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020.  Moreover, satisfying the typicality prong requires, in the least, that "a class representative must be part of the class." *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982).

Plaintiffs argue that the typicality requirement is satisfied because Plaintiff's survey "scientifically and reliably captured variations in the claims handlers' work activities, demonstrated that there is a finite list of tasks, and reliably measured how much time the proposed class spent on each." (Class Cert. Mot. at 10.)  Plaintiffs also state that the typical claims handler was subject to common supervisory procedures, was regularly monitored throughout the workweek by management, received training and written guidelines laying out the steps to be taken when evaluating a claim, lacked authority to formulate management or operating policies, did not decide whether Defendants should issue certain types of insurance policies, followed checklists, entered data and information gathered during investigations, needed approval for reserve or settlement amounts of their authority level, used forms and preformatted template documents when processing claims, and routinely worked overtime and missed meal and rest breaks without compensation. (*Id.* at 10–11.)

The Court finds that Plaintiffs have provided sufficient evidence that the conduct at issue is not unique to the named plaintiffs, and that other class members have been injured by the same course of conduct.  Plaintiffs provide evidence that all class members were uniformly classified as exempt and that they share similar job duties.  Plaintiffs also put forth evidence that Defendants imposed a general supervision structure on all Class Members regardless of their individual group or title. (*See* Class Cert. Mot. at 1–2.)  For these reasons, and because Defendants offer

no specific objections to typicality, the Court finds the typicality requirement is satisfied.

### D. Adequacy

Finally, Plaintiffs must demonstrate that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Parties are generally considered to be adequate representatives of absent class members if there are no conflicts of interest between the representatives and class members and if the Court is persuaded that counsel for the representatives will vigorously pursue the action." *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 153 (N.D. Cal. 1991) (citing *Gen. Tel. Co. of the Sw*, 457 U.S. at 156). Plaintiffs insist that Plaintiffs' and the class members' interests are completely assigned and that counsel will vigorously prosecute the action. (Class Cert. Mot. at 11.) As to class counsel, Mr. Shenoi states that he has significant experience litigating in both state and federal courts, and over the past several years has been plaintiffs' counsel in several proposed class action cases. (Shenoi Decl. I ¶¶ 3–6.) The same is true for Mr. Seplow, (*see* Dkt. No. 172 ¶¶ 2–10), and Mr. Rapkin, (*see* Dkt. No. 173 ¶¶ 2–14). Counsel has also been found to be qualified class counsel in prior actions. *See Braun* v. *Safeco Ins. Co. of Am.*, Case No. CV 13-00607 BRO (PLAx) (C.D. Cal.); *Pinto v. Liberty Mutual Ins. Co.*, Los Angeles Superior Court Case No. BC 570007; *McKercher v. Liberty Mutual Ins. Co.*, Los Angeles Superior Court Case No. BC 605656. Each named plaintiff also declares that their interests are completely aligned with those of the proposed class, and that they do not have any interests antagonistic to or in conflict with the class. (*See* Dkt. Nos. 175–183.) Based on these declarations, the Court is persuaded that Plaintiffs and counsel will adequately represent the interests of the Class. As such, the Court finds the adequacy requirement satisfied.

18.

### 3.  Rule 23(b)(3)

Of the three possible bases for certification under Rule 23(b), Plaintiffs seek certification under Rule 23(b)(3) which requires that "the questions of law or fact common to the members of the class predominate over any questions affecting individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).

The predominance inquiry "tests whether [the] proposed classes are sufficiently cohesive to warrant adjudication by representation" and "trains on the legal or factual questions that qualify each class member's case as a genuine controversy."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  In doing so, it "focuses on the relationship between the common and individual issues.  When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis."  *Hanlon*, 150 F.3d at 1022.  However, predominance does not require that the legal and factual issues be identical across the class.  Certification is proper where "common nucleus of facts and potential legal remedies dominates [the] litigation."  *Id.*

According to Plaintiffs, the predominant overriding issue is that Defendant misclassified Class Members as exempt.  (Class Cert. Mot. at 1.)  Plaintiffs argue that common questions predominate with respect to the "general supervision" prong and the "50%" prong.  (Class Cert. Mot. at 12–28.)  Plaintiffs class claims for failure to pay failure to provide meal periods and rest breaks under Labor Code section 226.7 are derivative of the misclassification claim.  (*Id.* at 28.)

### A. Whether Common Questions Predominate

The predominance analysis begins with the elements of the underlying causes of action.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011); *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014).  However,

both parties agree that this case will largely focus on application of the administrative exemption contained in Wage Order 4–2001. The Court will briefly address the common and individual questions raised by the five causes of action asserted by the Class, and then move on to the common and individual questions raised by the exemption analyses.

### a. Failure to Pay Overtime

The Class asserts that Defendants failed to pay overtime compensation in violation of California Labor Code section 510. (Compl. ¶¶ 86–88.) California Labor Code section 510 provides:

> Eight hours of labor constitutes a day's work. Any work in excess of
> eight hours in one workday and any work in excess of 40 hours in any
> one workweek and the first eight hours on the seventh day of work in any
> one workweek shall be compensated at the rate of no less than one and
> one-half times the regular rate of pay for an employee.

Cal. Lab. Code § 510.

Defendants do not seem to dispute that members of the Class were not paid overtime compensation and did, at least to some extent, work over eight hours some days. Undoubtedly, there will be individual inquiries into the precise amount of overtime that each employee worked. However, such damages determinations "are individual in nearly all wage-and-hour class actions." *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) (discussing *Brinker Rest. Corp. v. Superior Ct.*, 53 Cal. 4th 1004, 1018 (2012)). The necessity of such individual inquiries does not, by itself, end the predominance analysis. *See id.* at 513–14 (citing *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) and *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1089 (9th Cir. 2010)). Without yet considering the exemptions, common questions—such as, did Defendants have a policy or practice of not paying overtime to Class Members?—predominate over individual questions.

**b. Failure to Provide Accurate Wage Statements**

The Class claims that Defendants failed to provide timely and accurate wage statements, in violation of California Labor Code section 226(a).  (Compl. ¶¶ 92–94.) California Labor Code section 226(a) provides:

> Every employer shall . . . furnish each of her employees . . . an accurate itemized statement in writing showing . . . all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee.

Cal. Lab. Code § 226(a).  Unlike Plaintiffs' other causes of action where injury is either alleged or is obvious from the allegations, Plaintiffs fail to allege any injury arising from their receipt of allegedly inaccurate wage statements.  Plaintiffs merely plead violation of the statute.  After *Spokeo*, "the plausible pleading of a flat out violation of a statutory provision will not necessarily support a civil law suit in federal court since 'a bare procedural violation [of a law creating that right], divorced from any concrete harm' will not constitute an injury-in-fact as demanded by Article III." *Dutta v. State Farm Mutual Auto. Ins. Co.*, 895 F.3d 1166 (9th Cir. 2018) (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548–49 (2016) ("*Spokeo I*" )).

Because the Court cannot identify a single allegation relating to any possible injury suffered by Plaintiffs as a result of this alleged statutory violation, it is unable to determine whether Plaintiffs suffered a concrete injury for purposes of Article III Standing.  *Accord Godhigh c. Savers,* LLC, No., 16-cv-02874-WHO, 2016 WL 4585778, at *3 (N.D. Cal. Sept. 2, 2016) (finding the plaintiffs pled a concrete injury even when the allegations were relatively general where they alleged "that as a result of the non-compliant wage statements they were 'confused about whether they were paid properly and/or they were misinformed about how many total hours they worked in each pay period.'"); *McKenzie v. Fed. Express Corp.*, 765 F. Supp. 2d 1222, 1229 (C.D. Cal. 2011) (finding a violation of section 226(a) where workers were forced to

consult other records or documents to determine the total hours worked, which should have been determinable from the wage statement alone).

The Court cannot certify a class when the named Plaintiffs have failed to allege facts sufficient to support their own standing. *See Lierboe v. State Farm Mutual Auto. Ins. Co.*, 350 F.3d 1018, 1022–23 (9th Cir. 2003) (holding that a class may only be represented by a named plaintiff with standing); *see also Pence v. Andrus*, 586 F.2d 733, 736–37 (9th Cir. 1978) ("[I]n class actions, the named representatives must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."). Accordingly, Plaintiff's Motion to Certify the Class as to this claim is **DENIED**. For the same reasons, Plaintiffs' third cause of action is dismissed for lack of standing. *See Bernhardt v. Cty. of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2002) (holding that district courts may dismiss sua sponte an action for lack of standing) (citing Fed. R. Civ. P. 12(h)(3)).

### c. Failure to Provide Meal Periods and Rest Breaks

The proposed Class next asserts that Defendants failed to provide meal periods and rest breaks in violation of California Labor Code section 512. (Compl. ¶¶ 95–97, 98—100.) California Labor Code section 512 provides:

> An employer may not employ an employee for a work period of more than five hours per day without providing the employee with a meal period of not less than 30 minutes, except that if the total work period per day of the employee is no more than six hours, the meal period may be waived by mutual consent of both the employer and employee. An employer may not employ an employee for a work period of more than 10 hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual

consent of the employer and the employee only if the first meal period was not waived.

Cal. Lab. Code § 512(a).

After *Brinker,* common questions will often predominate with regard to meal and rest break claims. These common questions include: did the employer have a policy or practice to "relieve[ ] its employees of all duty?" *See id.* at 1040. Did the employer have a policy or practice to "relinquish[ ] control over [employee] activities?" *See id.* Did the employer have a policy or practice to "permit [employees] a reasonable opportunity to take an uninterrupted 30–minute break?" *See id.* A negative answer to any of these questions would mean that the employer failed to meet its affirmative obligation to provide—but not police—meal periods and rest breaks. *See id.* at 101. Furthermore, employers do not escape liability simply by having a formal policy of providing meal and rest breaks. *Id.* at 1040 (citing *Cicairos v. Summit Logistics, Inc.*, 133 Cal. App. 4th 949, 962–63 (2005)) ("[A]n employer may not undermine a formal policy of providing meal breaks by pressuring employees to perform their duties in ways that omit breaks."). Therefore, here, there is an additional common question of whether Defendants' compensation system "pressur[ed] employees to perform their duties in ways that omit breaks." *See id.*

Without yet considering the exemption, the Court finds that the Class's section 512 claim will raise predominantly common questions.

### d. Other Claims

The proposed Class asserts four other claims: late pay and waiting time penalties under California Labor Code sections 201, 202, and 203; unjust enrichment; unfair business practices under the Unfair Competition Law, California Business and Professions Code section 17200; and civil penalties under the Private Attorneys General Act. (Compl. ¶¶ 89–91, 105–108, 109–112, 113–117.) These claims are derivative of the three claims discussed above. Furthermore, Defendants raise no

arguments unique to any of these three claims.  (*See generally* Class Cert. Opp'n.)

To the extent that there are unique issues, the Court finds that those raise mostly common questions.  For example, late pay and waiting time penalties are appropriate if the defendants acted willfully.  *See* Cal. Lab. Code §§ 201–203.  As the Court will discuss in greater detail in its discussion on employment exemptions, there is significant evidence that Defendants implemented standardized compensation policies and had a standardized supervision structure.  Therefore, questions such as willfulness will likely rise and fall based on common evidence, and the Court finds that with regard to the three derivative claims, common questions predominate over individual questions.

### e.  Administrative Exemption

In the context of employment exemptions, individual inquiries are necessary because the "crucial touchstone" is the "employee's actual job duties and responsibilities."  *Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 830 (9th Cir. 2011).  But, "uniform corporate policies will often bear heavily on questions of predominance and superiority.  Indeed, courts have long found that comprehensive uniform policies detailing the job duties and responsibilities of employees carry great weight for certification purposes."  *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958–59 (9th Cir. 2009) (citing *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 160 (S.D.N.Y. 2008)).  "Such centralized rules, to the extent they reflect the realities of the workplace, suggest a uniformity among employees that is susceptible to common proof."  *Id.*

"It is, however, improper for a court to certify a class based solely on the existence of a uniform exemption policy . . . or solely on an employer's expectations that an employee will perform certain tasks and follow certain procedures."  *Boyd v. Bank of Am. Corp.*, 300 F.R.D. 431, 442 (C.D. Cal. 2014) (citing *Marlo v. UPS, Inc.*, 639 F.3d 942, 948 (9th Cir. 2011)).  Rather, courts should look to "whether the

employer exercised some level of centralized control in the form of standardized hierarchy, standardized corporate policies and procedures governing employees, uniform training programs, and other factors susceptible to common proof." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 946, 946 (9th Cir. 2009) (approving the approach of multiple district courts).

As noted above, the administrative exemption applies where an employee: (1) performs "office or nonmanual work directly related to management policies or general business operations" of the employer or its customers; (2) "customarily and regularly exercises discretion and independent judgment;" (3) "performs under only general supervision work along specialized or technical lines" or "executes under only general supervision special assignments and tasks;" (4) "primarily engage[s] in duties that meet the test of exemption;" and (5) earns a monthly salary of at least two times the state minimum wage.  Wage Order 4 at (a)–(g); *see also Eicher v. Advanced Bus. Integrators, Inc.*, 151 Cal. App. 4th 1363, 1371 (Cal. Ct. App. 2007).  The Wage Order expressly incorporates federal regulations interpreting the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.  See* Wage Order 4 at (A)(2)(f).

To defeat application of the administrative exemption, Plaintiffs need only demonstrate that one of the above elements is unsatisfied.  Thus, if Plaintiffs present the Court with common proof on any one element, Plaintiffs have met their burden to demonstrate it is possible to "resolve an issue that is central to the validity of each of [the Class Members] claims in one stroke." *Dukes*, 564 U.S. at 350.

Plaintiffs contend that Class Members were subject to a level of supervision that constituted more than "general supervision."  (Class Cert. Mot. at 12.)  According to Plaintiffs, "[a]lthough the proposed class handled different types of claims, had different levels of authority, did different types of work, had numerous different job titles, were in different claims organizations and lines of business . . . *each* claims handler and SIU investigator was subject to Defendants' uniform supervision

structure." (Class Cert. Mot. at 5.)  Plaintiffs state that "Defendants maintained the same organizational supervision policies across the class, which is part and parcel of their 'supervision structure.'"  (*Id.* at 5–6.)  Plaintiffs also argue that although the names of Defendants' manuals and guidelines changed over time, Defendants "*process* for claims handling has been essentially the same throughout the entire class period."  (Class Cert. Mot. at 7.)  Plaintiffs suggest that at any given time, each group had one set of applicable guidelines detailing their work.  (*Id.* at 7 n.xxviii.)

Plaintiff submitted evidence showing that all claims handlers had a "team manager" who supervised a group of five to nine handlers.  (*See id.* at 6; Dkt. No. 199, Declaration of Katherine A. Roberts ("Roberts Decl.") ¶¶ 12, 25, 26, 28, 32, 36, 37 at Exs. 9, 22, 23, 25, 29, 33, 34.)  Team managers were accessible to claims handlers during the "entire 37.6 hour work week" and had access to claims handlers' open files, "allowing [team managers] to leave instructions, comments, and notes" for handlers.  (Class Cert. Mot. at 6 & n.xiv; *see also* Roberts Decl. ¶¶ 8, 28, 40 at Exs. 5, 25, 37.)  Team managers also provided job training and mentoring, and met with their team members on a regular basis.  (*See* Class Cert. Mot. at 6 & n.xviii; Roberts Decl. ¶¶ 8, 12, 14, 16, 26, 31 at Exs. 5, 9, 11, 13, 23, 28 (various deposition transcripts from different employees, each of whom stated different meeting "requirements," ranging from daily to monthly).[1])  Handlers were required to get permission from team managers to deny claims or to set reserves or settlements over their authorized limits.  (Class Cert. Mot. at 6–7; Roberts Decl. ¶¶ 8, 16, 25, 28, 31 at Exs. 5, 13, 22, 25, 28.)  Defendants witnesses described team managers as the "direct manager for their team,"

---

[1] *See, e.g.*, Roberts Decl. ¶ 8, Ex. 5 at 69–70 ("Browning Depo.") (stating that team managers had one-on-one meetings with handlers "[g]enerally every other week"); ¶ 12, Ex. 9 at 51 ("Davis Depo.") (stating that his group has one-on-ones with their team manager every month); ¶ 28, Ex. 25 at 34 ("Machovsky Depo.") (stating "once a month we expect every team manager to meet with every individual for what we can a one-on-one").  *But see* Roberts Decl. ¶ 16, Ex. 13 at 183–84 ("Felser Depo.") (describing 20-minute "huddles" and monthly one-on-ones); ¶ 14, Ex. 11 at 102 (describing daily huddles).

"the person folks go to," and as providing direct supervision over handlers. (*See* Roberts Decl.¶ 17, Ex. 14 ("Fix Depo.") at 36 (explaining that team managers "are responsible for coaching their team, human resources-type activities. They review files. They provide guidance. You know, they are the direct manager for their team, so that's the person their folks go to"); ¶ 40, Ex. 37 ("Vizyak Depo.") at 132 (noting that in his opinion team managers offered "direct supervision" of handlers).)

Defendants counter that there is "astounding variability" between the supervision that occurred for each group, let alone with respect to each individual class member. (Class Cert. Opp'n at 25–26.) According to Defendants, Plaintiffs essentially admit that no single set of uniform guidelines applied to *all* class members across the board; the guidelines differed depending on the individual handler or SUI investigator's group. Further, the individual declarants also testify to a varying level of autonomy and oversight. (*Id.* at 26.) Defendants contend that the variation in *actual* work experience of the *adjuster*, not the team manager, is what the Court must consider in making its determination.

Here, the undisputed evidence shows that there was a uniform general supervision structure in place. Each Class Member had a team manager whom they met with monthly for one-on-ones, and daily for "huddles" following the implementation of a new program referred to as "LMS." Further, handlers needed permission before denying coverage on a claim or when they believed a claim exceeded their settlement or reserve authority. Team managers monitored Class Members' emails, phone calls, and regularly reviewed and audited their dairy entries. Members were also required to complete certain tasks within a certain time, and each team had a comprehensive manual or set of guidelines that detailed the process they should follow in performing their duties. (*See* Roberts Decl. ¶ 32, Ex 29 ("Myers Depo.") at 132 (acknowledging that established guidelines exist); Machovsky Depo. at 19, 20); Browning Depo. at 23, 24.).) Accordingly, Plaintiffs' evidence of stringent,

standardized supervision policies and procedures is sufficient to raise a predominant question common to the class as to at least one prong of the administrative exemption. *See Metrow v. Liberty Mutual Managed Care LLC*, No. EDCV 16–1133 JGB (KKx), 2017 WL 4786093, at *10 (C.D. Cal. May 1, 2017) (finding predominance on similar facts); *Dobrovsky v. Arthur J. Gallagher Serv. Co., LLC*, No. EDCV 13-0646 JGB (SPx), 2014 WL 10988092, at *10–11 (C.D. Cal. July 30, 2014) (same).  Although several individual inquiries exist, such as whether an employee significantly deviated from the requirements set out by the guidelines or whether any supervisor deviated from the standard supervision procedures, after a "close look," the Court finds that "common questions predominate over individual ones."  *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

However, the Court finds that this case would benefit from division into additional subclasses.  Although it may be true that each group of handlers was subject to a certain general supervision structure, the evidence shows that the levels of supervision may have differed by group and that the guidelines did differ by group.  Accordingly, the Court proposes five subclasses, including: (1) Bodily Injury Claims Handlers, (2) Worker's Compensation Claims Handlers, (3) Property Claims Handlers, (4) SIU Investigators, and (5) Claims Handlers Who Managed Litigated Files.  While the common questions presented above still remain as to each group, separation into these subclasses creates a more manageable picture regarding which handlers were subject to which guidelines, which TM's supervised which group, and what level of supervision was imposed.

## B. Superiority

Finally, class certification is appropriate only if class resolution is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3). Defendant argues that the amount of individual inquiries preclude superiority.

The Court disagrees.  The Court recognizes that there will be some need for individual inquiries, but "courts in overtime cases such as this may properly couple uniform findings on common issues regarding the proper classification of the position at issue with innovative procedural tools that can efficiently resolve individual questions regarding eligibility and damages."  *See Tierno v. Rite Aid Corp.*, No. C 05–02520 TEH, 2006 WL 2535056, at \*10–11 (citing *Sav–On Drug Stores, Inc. v. Superior Ct.*, 34 Cal. 4th 319, 332 (2004)).  For example, courts can employ "administrative mini-proceedings, special master hearings, and specially fashioned formulas or surveys." *Id.* at \*11.  The availability of these tools, coupled with the predominance of common questions, demonstrates that this class is manageable, and will "achieve economies of time, effort, and expense . . . without sacrificing procedural fairness or bringing about other undesirable results." *See Amchem Prods.*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23(b)(3) Adv. Comm. Notes to 1966 Amendment).  Accordingly, the Court finds that class resolution is superior to other available methods of resolving the claims at issue.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification is **GRANTED in part**.  (Dkt. No. 170).  The Court certifies the Class and the Waiting Time Penalties Subclass as to all claims except the accurate wage statement claim. (*See* Class Cert. Mot. at iii, iv (definition of Class and Subclass).)  The Court further separates the Class into the following additional subclasses: (1) Bodily Injury Claims Handlers, (2) Worker's Compensation Claims Handlers, (3) Property Claims Handlers, (4) SIU Investigators, and (5) Claims Handlers Who Managed Litigated Files.

The Court appoints Trinidad Lopez, Marisela Beas, Gregory Rutkowski, Pamela Lewis, Amane Perez, Nathan Felser, Gina McPherson, Nancy Lee Yang, and

1 Jennifer Doud as class representatives.[2]  The Court appoints Shenoi Koes LLP,

2 Schonbrun Seplow Harris & Hfoffmann LLP, Rapkin & Associates, LLP and V.

3 James Desimone Law as class counsel.

4     Defendants' Motion to Strike the Report of Jon Krosnick, (Dkt. No. 260), and

5 Plaintiffs' Motions to Strike the Reports of Dr. Reardon, (Dkt. No. 291), and Dr.

6 Wilcox (Dkt. No. 292), are **DENIED** as moot.

7

8 **IT IS SO ORDERED.**

9

10 Dated: September 24, 2018

11 

12 _____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

---

[2] On September 6, 2018, Plaintiffs' counsel notified the Court of the passing of proposed class representative Anthony Castillo.  (*See* Dkt. No. 318.)  Based on this information, the Court does not appoint Mr. Castillo as a class representative.