Douglas R. Hart, SBN 115673
dhart@sidley.com
Mark D. Campbell, SBN 180528
mcampbell@sidley.com
David Carpenter, SBN 230299
drcarpenter@sidley.com
Katherine A. Roberts, SBN 259486
kate.roberts@sidley.com
Beth A. Scheel, SBN 202064
bscheel@sidley.com
Sheryl K. Horwitz, SBN 229115
shorwitz@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone:  (213) 896-6000
Facsimile:  (213) 896-6600

Attorneys for Defendants Liberty Mutual Insurance Company, Golden Eagle
Insurance Corporation and Safeco Insurance Company of America

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRINIDAD LOPEZ, an individual, <br><br> Plaintiff, <br><br> vs. <br><br> LIBERTY MUTUAL INSURANCE COMPANY, and DOES 1 through 50, inclusive, <br><br> Defendants. | Case No. 2:14-cv-05576 BRO (JCx) <br> Case No. 2:14-cv-05748 BRO (JCx) <br><br> Assigned to the Honorable Andre Birotte, Jr. <br><br> **DECLARATION OF JUSTIN MCCRARY, PH.D. IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| MARISELA BEAS et al., <br><br> Plaintiffs, <br><br> vs. <br><br> LIBERTY MUTUAL INSURANCE COMPANY, GOLDEN EAGLE INSURANCE CORPORATION; SAFECO INSURANCE COMPANY OF AMERICA, and DOES 1-10, inclusive, <br><br> Defendants. | *[Filed Concurrently with Opposition; Declarations of Sonia Vucetic, Douglas R. Hart, and Ronald Wilcox; Statement of Genuine Issues and Additional Material Facts; Request for Judicial Notice]* <br><br> Hearing:    February 1, 2019 <br> Time:       10:00 a.m. <br> Place:      Courtroom 7B |

| I. | Qualifications | 1 |
| II. | Background and Assignment | 3 |
| III. | Summary of Opinions | 3 |
| IV. | Data Must Be Collected that Accurately Measure the Variables of Interest | 4 |
| V. | A Sample Must Be Representative of the Population of Interest | 5 |
| VI. | The Estimation Methodology Used Must Be Unbiased | 6 |
| VII. | A Margin of Error Must Be Accurately Calculated and Sufficiently Precise | 8 |
| VIII. | Conclusion | 8 |

## I.    Qualifications

1.    I am the Paul J. Evanson Professor of Law at Columbia Law School, where I teach corporations, antitrust, economics, and statistics.  I am an economist by training, with expertise in economic modeling, statistical methods, damages methodologies, law and economics, and labor economics, among other subjects.  I received my A.B. in Public Policy from Princeton University in 1996.  After working at National Economics Research Associates in White Plains, New York, and the Federal Reserve Bank of New York from 1996 to 1998, I began my Ph.D. in Economics at the University of California, Berkeley ("Berkeley"), completing the degree in June 2003.  After close to five years as Assistant Professor at the University of Michigan ("Michigan"), I became Assistant Professor of Law at Berkeley in January 2008 and was promoted to Professor in July 2010, a position I held through June 2018.  While at Berkeley, I taught courses on introductory, intermediate, and advanced statistics to J.D., L.L.M., and Ph.D. students; on law and economics to J.D. students as well as undergraduates; on labor economics to Ph.D. students in economics and in other fields; and on business law to J.D., L.L.M., and M.B.A. students.

2.    While at Berkeley, I served as the Founding Director of D-Lab, the Social Sciences Data Laboratory at Berkeley, from July 2014 to June 2017, at which point I stepped down to visit Columbia.  D-Lab trains graduate students in statistical and data science techniques relevant to modern computation and modern data collections.  In addition, the D-Lab archives major data collections, such as those associated with the Census Research Data Centers, the financial market, birth certificate data, and other large-scale collections of import.  At D-Lab, I lectured and advised graduate students and faculty regarding high-performance and high-throughput computing, statistical software, and statistical and econometric techniques.

3.    From September 2009 until July 2014, when I began to direct the D-Lab, I co-directed the Law and Economics Program at Berkeley Law.  Since 2017, I have been a member of the Board of Directors of the American Law and Economics Association.

4.    Since 2008, I have co-directed the Economics of Crime Working Group of the National Bureau of Economic Research ("NBER").   The NBER is the preeminent professional association of economists in the world, with over 1,400 members worldwide.  I was invited to

become a Faculty Research Fellow of the NBER in 2006 and remained in that position until 2012, when I was invited to become a Faculty Research Associate, a position I hold today.

5.      As noted, I previously worked at Michigan. From 2003 through 2007, I was Assistant Professor of Public Policy and Assistant Professor of Economics. While at Michigan, I taught introductory statistics and advanced microeconomic theory to M.P.P. students, and advanced econometric theory to Ph.D. students.

6.      My research spans a diverse range of topics, including econometric and statistical methodology, employment discrimination, income inequality, education, crime, antitrust, fertility, financial markets, and monetary policy. Many of my articles have been published in leading journals within economics, such as the *American Economic Review*, the *Review of Economics and Statistics*, the *Journal of Economic Literature*, and the *Journal of Econometrics*.

7.      Over the years, my research has been supported by Michigan, Berkeley, the MacArthur Foundation, the NBER, the National Institutes of Health, the National Science Foundation, the Arnold Foundation, the Spencer Foundation, and the Robert Wood Johnson Foundation.

8.      I regularly review articles for the leading peer reviewed journals within economics, including *Econometrica*, the *American Economic Review*, the *Quarterly Journal of Economics*, the *Journal of Political Economy*, the *Review of Economic Studies*, the *Journal of Econometrics*, the *Review of Economics and Statistics*, and the *American Law and Economics Review*. Peer review specifically focuses on assessing whether submitted manuscripts are employing methodologies that are consistent with academic standards.

9.      My consulting and testifying experience spans a wide range of industries and markets. For example, I have previously provided an economic analysis on the differences between an employee and an independent contractor; analyzed damages associated with alleged price-fixing conspiracies in the corrugated packaging industry, several high-technology product markets, and retail gasoline; assessed the evidence of liability in connection with alleged price-fixing conspiracies in a high technology product and in a two-sided market; analyzed damages in connection with contractual disputes; assessed the extent to which alleged collusive behavior among health care providers affected prices; assessed the extent of infringing sales in a patent lawsuit pertaining to pharmaceuticals; and assessed the potential anti-competitive implications of a proposed telecommunications merger, among others.

10.     A copy of my curriculum vitae, including a list of previous testimony and depositions, is included as Appendix A. A complete list of materials considered in forming my opinions is contained in Appendix B to this declaration. I reserve the right to amend or update the opinions in this report should additional information be made available to me.

11.     I am being compensated at my hourly rate of $850. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither Cornerstone Research's compensation nor mine is contingent upon the conclusions I reach or on the outcome of this matter.

## II.     Background and Assignment

12.     I have been retained by Liberty Mutual through Sidley Austin to review and opine on the expert report submitted by Professor Jon Krosnick dated December 5, 2018 ("Krosnick Damages Report").[1] Specifically, I was asked to review and opine on the statistical reliability of Professor Krosnick's damages calculations.

13.     I have not been asked to assess the design and reliability of the survey conducted by Professor Krosnick for the purposes of my opinions in this declaration. I understand that another expert has been retained to opine on those issues.

## III.     Summary of Opinions

14.     Statistical analysis rests on four pillars: (1) the researcher must accurately measure the variables of interest and disclose all necessary assumptions; (2) the researcher must obtain a sample that is representative of the target population; (3) the researcher must use an estimation methodology that is unbiased; and (4) the researcher must use an accurate methodology for calculating a margin of error, and obtain a margin of error that is sufficiently precise to inform the question of interest.

---

[1] Fourth Report of Dr. Jon A. Krosnick, December 5, 2018 ("Krosnick Damages Report").

15.     The absence of any one of these pillars may and usually would render a statistical analysis unreliable.[2]  The absence of multiple pillars does render a statistical analysis unreliable. Based on my review of Professor Krosnick's damages report and calculations, none of these pillars is present in his damages analysis.  In my view, this renders his damages calculation unreliable and its results uninformative.

16.     The remainder of this report describes how Professor Krosnick's damages report fails with respect to each of these four pillars.

## IV.    Data Must Be Collected that Accurately Measure the Variables of Interest

17.     The first step in any statistical analysis is to collect the variables of interest accurately and reliably.[3]  In this case, because the ultimate quantity of interest is damages, that means collecting accurate measures of all of the variables that go into Professor Krosnick's damages calculation.  However, Professor Krosnick ignores the potential for such errors to arise from flaws in his survey design, and, in particular, the difficulty respondents may have in accurately reporting the information Professor Krosnick attempts to collect from his survey.  For example, error could be introduced into individual respondents' answers if respondents have imperfect recall, are confused about what Professor Krosnick is asking for, or even make arithmetic errors in calculating the variables Professor Krosnick seeks to measure.  I understand that another expert in this matter has reviewed Professor Krosnick's survey in detail and found issues with Professor Krosnick's survey design that resulted in his results being unreliable.[4]  That expert drew on literature on memory, recall, task difficulty, and respondent fatigue, all of which are aspects of data collection that can lead to inaccurate and unreliable measures.

18.     The economics literature has previously documented the extent to which survey data is inaccurate as a result of imperfect recall from survey respondents.  Survey data (including hours worked specifically) in important and widely-studied public data sets such as the Current

---

[2] There can be exceptions to this general rule.  For example, there are estimates that are not unbiased yet whose bias is known to decline as the sample size grows.  For a sufficiently large data set, such an estimation methodology can be thought of as approximately unbiased, in which case a statistical analysis could be reliable despite using an estimation methodology that is not unbiased.

[3] Anderson, David R., Dennis J. Sweeny, and Thomas A. Williams, *Statistics for Business and Economics*, 10th Edition, Thomson South-Western, Mason, OH 2008, p. 22-5 ("One of the most common types of nonsampling error occurs whenever we incorrectly measure the characteristic of interest.").

[4] Expert Report of Ronald T. Wilcox, May 7, 2018 ("Wilcox Report").

Population Survey and the Panel Study of Income Dynamics have been audited by comparing survey responses to administrative records provided by firms assisting with the audit analyses. In a discussion of these types of studies, Nobel Prize-winning economist James Heckman states that, according to the evidence, "labor supply and hourly wages are badly mismeasured."[5] He further states: "Interviewing workers and comparing interview responses with firm records, [these audit studies] find systematic biases in labor supply and wage data. Measurement error in hours and hourly wages neither has a mean of zero nor is it uncorrelated with [the] true values of own and other variables as is assumed in textbook discussions."[6] In other words, surveys soliciting the same type of information Professor Krosnick attempts to measure have been shown to be imperfect tools to assess hours worked.

## V.   A Sample Must Be Representative of the Population of Interest

19.     The second pillar of statistical analysis is the use of a sample that is representative of the correct population.[7] If a sample is not representative of the target population, then it is inappropriate to extrapolate any sample estimate to the population. Here, the sample is the survey respondents who completed the survey, and the population is the class. Note that using a sample that is not representative of the population cripples the reliability of a statistical analysis, even if all variables are measured accurately and reliably.[8] Professor Krosnick fails to address the implications non-response bias in his survey sample may have for his damages analysis.

20.     Professor Krosnick assumes that non-respondents are similar to respondents in his sample. This is a dubious assumption. Professor Krosnick's own survey shows that 85 percent of respondents "remember hearing or reading something" about a lawsuit involving Liberty Mutual, Safeco, or Golden Eagle.[9] If respondents were more aware of the lawsuit than non-

---

[5] Heckman, James J., "What Has Been Learned About Labor Supply in the Past Twenty Years?" *American Economic Review,* 83(2), p. 120.
[6] Heckman, James J., "What Has Been Learned About Labor Supply in the Past Twenty Years?" *American Economic Review,* 83(2), p. 120.
[7] Anderson, David R., Dennis J. Sweeny, and Thomas A. Williams, *Statistics for Business and Economics,* 10th Edition, Thomson South-Western, Mason, OH 2008, p. 22-5 ("Errors due to nonresponse are a concern to both the statistician responsible for designing the survey and the manager using the results.").
[8] Manski, Charles F., *Identification for Prediction and Decision,* Harvard University Press, Cambridge, MA 2007, pp. 45–46.
[9] Report of Dr. Jon A. Krosnick, August 28, 2017 ("Krosnick Report"), ¶¶ 241–242.

respondents, their responses to the survey questions may differ systematically from those that
non-respondents would have given. Respondents may also differ from non-respondents on other
dimensions as well.

21.     Moreover, differences between respondents and non-respondents may affect the accuracy
of the variables measured, the topic discussed in the prior section. Class members have a direct
financial incentive to report an elevated number of unpaid overtime hours worked and an
elevated number of days with missed breaks.

22.     This logic may extend to the choice to take the survey in the first place: even if all
potential survey respondents were aware of the litigation, class members who recall having
worked some overtime hours or having missed breaks may be more likely to respond to a request
for an interview than those who did not work overtime hours or miss breaks. Professor Krosnick
cannot rule out the possibility that only class members who believed they are owed damages
from unpaid overtime hours or missed breaks took the survey.[10]

## VI.    The Estimation Methodology Used Must Be Unbiased

23.     The third pillar of statistical analysis is to define an estimation methodology that will
provide an unbiased estimate of the population quantity of interest.[11] Extrapolation to the
population is inappropriate unless the estimation methodology is unbiased or at least consistent
in the statistical sense.

24.     Here, too, Professor Krosnick has introduced errors into his damages calculation.
Professor Krosnick estimates two averages from his survey data in order to calculate damages:
average hours owed for unpaid overtime per week and the average of the ratio of weeks not
worked over the class period to weeks employed over the class period. He combines this with an
average of the wage rate paid taken from administrative data. Even assuming Professor
Krosnick has appropriately measured these variables of interest, it is incorrect from a statistical
perspective to multiply sample or even population averages in an attempt to arrive at an estimate

---

[10] I understand that another expert in this matter has reviewed Professor Krosnick's survey in detail and found issues
with Professor Krosnick's survey design relating to possible demand effects. Wilcox Report, ¶¶ 58–67.

[11] Anderson, David R., Dennis J. Sweeny, and Thomas A. Williams, *Statistics for Business and Economics*, 10th
Edition, Thomson South-Western, Mason, OH 2008, p. 285 ("[B]efore using a sample statistic as a point estimator,
statisticians check to see whether the sample statistic demonstrates certain properties associated with good point
estimators... the properties of good point estimators [are]: unbiased, efficiency, and consistency.").

of the population value that can be calculated at the individual level, and then averaged. Stated differently, it is not true that the average of the product is equal to the product of the average. Moreover, even if each of the two sample averages are unbiased estimators of the true population value, the product of the two sample averages may not itself be an unbiased estimator of population value of interest.

25.    The direction of the bias that may arise in the estimate depends on the correlation between the variables of interest.[12] If two variables are negatively correlated, multiplying the averages of the two variables as Professor Krosnick has done will result in an overestimate of the expected value of the two variables multiplied together at an individual level. Consider a simple example where three respondents (A, B, and C) give negatively correlated answers to two questions (X and Y) shown in the table below.

| Respondent | Question | | Within Respondent Product |
| | X | Y | |
| --- | --- | --- | --- |
| A | 1 | 6 | 6 |
| B | 3 | 4 | 12 |
| C | 5 | 2 | 10 |
| Question Average | 3 | 4 | |

26.    The average of the responses to question X, shown at the bottom of the column, is 3, while the average of responses to question Y is 4. The product of those averages is 12. This is the approach Professor Krosnick used to calculate damages, taking averages across each survey response, then multiplying the averages to arrive at his damages estimates. However, multiplying the responses to questions X and Y at an individual level, then taking the average of that product results in an estimate of 9.33.

27.    Professor Krosnick attempts to demonstrate that these biases will not influence his damages calculation by showing that average hours owed for unpaid overtime per week and the

---

[12] The expected value of the product of two random variables is equal to the product of the expected value of each random variable, plus the covariance between the two random variables. If the covariance is positive, the expected value of the product of the two random variables will be greater than the product of the expected values of each random variable. If the two random variables are independent, the expected value of the product of those two random variables is equivalent to the product of the expected value of the two random variables separately. Wackerly, Dennis D., William Mendenhall, and Richard L. Scheaffer, *Mathematical Statistics with Applications,* 7th Edition, Thomson Brooks/Cole, Belmont, CA 2008, pp. 266–267.

total number of weeks employed during the class period are uncorrelated.[13]  However, this analysis does not address whether the variables used in his damages calculation (overtime hours worked, missed meal and rest breaks, and total weeks worked) are correlated in some way that will cause his damages estimate to be biased.

## VII.    A Margin of Error Must Be Accurately Calculated and Sufficiently Precise

28.    The fourth pillar of statistical analysis involves a methodology for assessing the sampling error associated with the quantity of interest.  Sampling error refers to the variation in the estimate that is attributable to having used a sample of data instead of the entire population.[14] Statistics is able, under assumptions, to reliably quantify sampling error from the one sample itself.  In many situations, the metric for sampling error is a margin of error, such as that familiar from political polls.  However, sampling error can sometimes be large enough that little is learned from the sample, and this would render the statistical analysis unreliable.

29.    Here, the quantity of interest here is damages.  Professor Krosnick does report confidence intervals for his estimates of overtime hours worked, hours owed from missed meal and rest breaks, and average number of weeks not worked.[15]  However, I see no evidence in his damages report that he has either defined a methodology for or calculated a margin of error around his final damages estimate.

## VIII.  Conclusion

30.    Based on my review of Professor Krosnick's damages report and calculations, I find that none of the pillars of reliable statistical analysis are present in his damages analysis. Specifically, I find that Professor Krosnick had potential issues with his data collection in his survey, potentially relied on a sample not representative of the population of interest, used an estimation methodology that is potentially biased, and did not properly account for the margin of

---

[13] Krosnick Damages Report, ¶¶ 40–41.

[14] Anderson, David R., Dennis J. Sweeny, and Thomas A. Williams, *Statistics for Business and Economics*, 10th Edition, Thomson South-Western, Mason, OH 2008, pp. 22-5–22-6.

[15] Krosnick Damages Report, ¶ 20.

error around his final damages estimate.  Thus, I conclude that Professor Krosnick's damages calculation is unreliable and its results are uninformative.

I make this declaration under penalty of perjury under the laws of the United States and the State of California this 21st day of December, 2018, at New York City, New York and can and will testify that the foregoing is true and correct, if called as a witness.

Justin McCrary, Ph.D.

December 21, 2018

**APPENDIX A**

# Justin McCrary

Columbia University
School of Law
632 Jerome Greene Hall
New York, NY 10027

University of California, Berkeley
School of Law
586 Simon Hall
Berkeley, CA 94708

Cell Phone:    (510) 409-6418
Email:         justin.mccrary@gmail.com
Homepage:      https://www.law.columbia.edu/faculty/justin-mccrary

## Current Appointments

Columbia University
2018–     Paul J. Evanson Professor of Law

University of California, Berkeley
2010–     Professor of Law
2008–10   Assistant Professor of Law

National Bureau of Economic Research
2012–     Faculty Research Associate
2006–12   Faculty Research Fellow

## Past Appointments

Columbia University
Fall 2017  Samuel Rubin Visiting Professor of Law

University of California, Berkeley
2014–17    Director, Social Sciences Data Laboratory (D-Lab)

University of Michigan
2003–07    Assistant Professor, Gerald R. Ford School of Public Policy
2003–07    Assistant Professor, Department of Economics (courtesy)

European Central Bank (Banco de España)
2013–14    Economist

Federal Reserve Bank of New York
1996–98    Assistant Economist

## Education

Ph.D. Economics, University of California, Berkeley, 2003

A.B. Public Policy, Princeton University, 1996

*CV for Justin McCrary*                                    **APPENDIX A**  2

## Testimony Experience

*Samsung Electronics Co., Ltd., v. Kuroda Electric Co., Ltd., Sakai Display Products Corporation and Sharp Corporation*
International Chamber of Commerce

    Contractual dispute

    Testimony regarding economic theory, data science, statistics

    Retained by Samsung Electronics Co.

    Arbitration testimony on December 20, 2018

    Report filed on September 28, 2018

*In re: Part 60 RMBS Put-Back Litigation*
Supreme Court of the State of New York, County of New York

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained by Morgan Stanley Mortgage Capital Holdings LLC

    Deposed on November 27, 2018

    Report filed on June 22, 2018

*In Re: RFC and ResCap Liquidating Trust Litigation*
U.S. District Court for the District of Minnesota and
U.S. Bankruptcy Court for the Southern District of New York

    Mortgage-backed securities case

    Testimony regarding sampling, damages, and statistical concepts

    Retained by Advanced Financial Services, BMO Harris Bank, Cadence Bank, Colonial Savings, CTX Mortgage, Decision One, First Guaranty, Freedom Mortgage, Home Loan Center, HSBC Mortgage, Impac Funding, PNC, Provident, Standard Pacific, Synovus, and Universal American

    Jury trial testimony on November 1, 2018 (Minnesota; Home Loan Center)

    Report filed on June 14, 2018

    Deposed on April 24, 2018

    Rebuttal to supplemental disclosure filed on February 26, 2018

    Rebuttal report filed on October 27, 2017

*In re Foreign Exchange Benchmark Rates Antitrust Litigation*
U.S. District Court for the Southern District of New York

    Antitrust price fixing case (Sherman Act §§ 1, 3 and Commodity Exchange Act)

    Testimony regarding trader communications and sampling methodologies

    Retained by Credit Suisse

    Report filed on October 25, 2018

*Financial Guaranty Insurance Company v. Morgan Stanley ABS Capital I Inc. and Morgan Stanley Mortgage Capital Holdings LLC*
Supreme Court of the State of New York, County of New York

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained by Morgan Stanley

    Report filed on October 19, 2018

*Shamrell v. Apple Inc.*
Superior Court of the State of California, County of San Diego

    Putative class action regarding products liability, Unfair Competition Law and Consumers Legal Remedies Act

    Testimony regarding heterogeneity across putative class members, failure rate methodologies, econometrics, and data science

    Retained by Apple, Inc.

    Supplemental class certification report filed on October 17, 2018

    Class certification report filed on March 29, 2017

    Rebuttal report filed on February 1, 2017

*Residential Funding Company v. Universal American Mortgage Co.*
United States District Court for the District of Minnesota

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained by Universal American Mortgage Co.

    Report filed on August 30, 2018

*In re Gateway Plaza Residents Litigation*
Supreme Court of the State of New York, County of New York

    Putative class action regarding warranty of habitability

    Testimony regarding electricity usage, individual preferences and choices, and heterogeneity across putative class members; large scale data analysis

    Retained by Gateway Plaza

    Supplemental class certification and rebuttal report filed on August 8, 2018

    Class certification report filed on September 18, 2017

*Financial Guaranty Insurance Company v. Morgan Stanley*
Supreme Court of the State of New York, County of New York

    Mortgage-backed securities case

    Testimony regarding sampling and statistical methods

    Retained by Morgan Stanley

    Report filed on August 7, 2018

*United States of America v. SavaSeniorCare*
U.S. District Court for the Middle District of Tennessee

    False Claims Act case

    Testimony regarding sampling and statistical methods

    Retained by SavaSeniorCare

    Rebuttal report filed on August 6, 2018

*Latoya Brown et al. v. Madison County, Mississippi*
U.S. District Court for the Southern District of Mississippi

    Putative class action alleging violations of Section 1983 and the Fourth and Fourteenth Amendments

    Testimony regarding regression methodologies, measurement error, and data science

    Retained by Latoya Brown et al.

    Report filed on July 2, 2018

*CV for Justin McCrary*                                                  **APPENDIX A**   4

*Martin Dulberg et al. v. Uber Technologies, Inc. and Rasier, LLC*
U.S. District Court for the Northern District of California

   Putative class action alleging breach of contract

   Testimony regarding heterogeneity in damages across putative class members

   Retained by Uber Technologies, Inc.

   Supplemental report filed on June 28, 2018

   Affirmative report filed on January 11, 2018

*Tri-City, LLC; Endor Car and Driver, LLC; Zehn-NY, LLC; Zwei-NY, LLC; Abatar, LLC; and Flatiron Transit, LLC v. New York Taxi and Limousine Commission and Meera Joshi*
Supreme Court of the State of New York, County of New York

   Article 78 proceeding challenging an administrative ruling

   Testimony regarding mismatch between accessibility regulation and accessibility demand

   Retained by plaintiffs

   Supplemental report filed on May 18, 2018

   Affirmative report filed on April 13, 2018

*Federal Home Loan Bank of Boston, v. Ally Financial, Inc., et al.*
Superior Court of the State of Massachusetts, Business Litigation Session, Suffolk County

   Mortgage-backed securities case

   Testimony regarding sampling and statistical methods

   Retained by Morgan Stanley

   Rebuttal report filed on May 17, 2018

*Cheryl Phipps and Shawn Gibbons v. Wal-Mart Stores, Inc.*
United States District Court for the Middle District of Tennessee

   Putative class action alleging discrimination in employment

   Testimony regarding the decentralized nature of Walmart's internal labor market and concomitant heterogeneity across proposed class members in pay and promotion outcomes

   Retained by Walmart

   Deposed on April 30, 2018

   Rebuttal report filed on April 20, 2018

*People of the State of California v. Morgan Stanley & Co.*
Superior Court of the State of California, County of San Francisco

   Mortgage-backed securities case

   Testimony regarding sampling and statistical methods

   Retained by Morgan Stanley & Co.

   Deposed on February 9, 2018

   Rebuttal report filed on January 25, 2018

*Tony Dickey and Paul Parmer et al. v. Advanced Micro Devices, Inc.*
U.S. District Court for the Northern District of California

   Putative class action alleging false advertising

   Testimony regarding availability of information regarding and market for computer chips and heterogeneity across putative class members

   Retained by Advanced Micro Devices

   Rebuttal report filed on January 26, 2018

*Federal Home Loan Bank of Chicago v. Banc of America Funding Corporation, et al.*
Circuit Court of Cook County, Illinois, County Department, Chancery Division

   Mortgage-backed securities case

   Testimony regarding sampling, regression, and statistical methods

   Retained by Morgan Stanley

   Deposed on December 14, 2017

   Rebuttal report filed on August 21, 2017

*In re Lehman Brothers Holdings, Inc., et al., Debtors*
U.S. Bankruptcy Court for the Southern District of New York

   Mortgage-backed securities case

   Testimony regarding sampling, resampling methods for inference, and statistical methods

   Retained by Lehman Brothers Holdings, Inc.

   Deposed on October 9, 2017

   Rebuttal report filed on August 28, 2017

*Deutsche Bank National Trust Company v. Morgan Stanley Mortgage Capital Holdings LLC*
U.S. District Court for the Southern District of New York

   Mortgage-backed securities case

   Testimony regarding sampling and statistical methods

   Retained by Morgan Stanley Mortgage Capital Holdings LLC

   Deposed on March 27, 2017

   Rebuttal report filed on December 16, 2016

*Rosen v. Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

   Putative class action regarding false advertising

   Testimony regarding economics of safety

   Retained by Uber Technologies, Inc.

   Deposed on February 3, 2017

   Rebuttal report filed on January 13, 2017

   Affirmative report filed on December 2, 2016

*Blackrock Allocation Target Shares: Series S Portfolio, et al., v. Wells Fargo Bank, N.A.; Royal Park Investments SA/NV v. Wells Fargo Bank, N.A., as Trustee; National Credit Union Administration Board, et al., v. Wells Fargo Bank, N.A.; Phoenix Light SF Limited, et al., v. Wells Fargo Bank, N.A.; and Commerzbank AG v. Wells Fargo Bank, N.A.*
U.S. District Court for the Southern District of New York

   Mortgage-backed securities case

   Testimony regarding sampling and statistical methods

   Retained by Wells Fargo Bank

   Report filed on January 18, 2017

*CV for Justin McCrary*                                    **APPENDIX A**   6

*LA Taxi Cooperative, Inc. et al. v. Uber Technologies, Inc.*
U.S. District Court for the Northern District of California
> False advertising case

> Testimony regarding economics of safety

> Retained by Uber Technologies, Inc.

> Rebuttal report filed on January 13, 2017

> Affirmative report filed on November 18, 2016

*State of Illinois v. Hitachi Ltd., et al.*
Circuit Court of Cook County, Illinois, County Department, Chancery Division
> Antitrust price-fixing case

> Testimony regarding liability and damages

> Retained by Hitachi Ltd.

> Report filed on November 11, 2016

*In re: City of San Bernardino, California, Debtor*
U.S. Bankruptcy Court, Central District of California, Riverside Division
> Municipal bankruptcy case

> Testimony regarding economics, econometrics, rare risks and the value of a statistical life

> Retained by the City of San Bernardino

> Report filed on October 3, 2016

*U.S. Bank National Association v. Morgan Stanley Mortgage Capital Holdings LLC*
Supreme Court of the State of New York, County of New York
> Mortgage-backed securities case

> Testimony regarding sampling and statistical methods

> Retained by Morgan Stanley Mortgage Capital Holdings LLC

> Deposed on September 10, 2016

> Report filed on June 17, 2016

*National Credit Union Administration Board v. RBS Securities, Inc.*
U.S. District Court for the Central District of California &
U.S. District Court for the District of Kansas
> Mortgage-backed securities case

> Testimony regarding sampling and statistical methods

> Retained by RBS Securities

> Deposed on January 28, 2016

> Report filed on October 16, 2015

*Temple-Inland, Inc., v. Thomas Cook, et al.*
U.S. District Court for the District of Delaware
> Escheat law case

> Testimony regarding sampling, statistical methods, and economic theory

> Retained by the State of Delaware

> Deposed on November 24, 2015

> Report filed on October 23, 2015

**APPENDIX A**  7

*National Consumer Protection Service v. Farmacias Cruz Verde S.A. et al.*
Honorable Civil Court of Santiago (Chile)

 Antitrust putative class action

 Testimony regarding appropriate methods for estimating damages

 Retained by Salcobrand

 Report filed on November 14, 2015

*Douglas O'Connor, et al., v. Uber Technologies, Inc.*
U.S. District Court for the Northern District of California

 Putative class action regarding independent contractor versus employee

 Testimony regarding heterogeneity in alleged damages across putative class members, potential for class conflict

 Retained by Uber Technologies, Inc.

 Report filed on October 27, 2015

 Report filed on July 7, 2015

*Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*
U.S. District Court for the District of Massachusetts

 Discovery dispute in affirmative action case

 Testimony regarding necessary inputs into statistical methodologies

 Retained by Harvard College

 Report filed on July 30, 2015

*Securities and Exchange Commission v. James V. Mazzo and David L. Parker*
U.S. District Court for the Central District of California

 Civil insider trading suit

 Testimony regarding probability theory and statistics

 Retained by James V. Mazzo and David L. Parker

 Deposed on May 13, 2015

 Report filed on March 13, 2015

*In re: City of Stockton, California, Debtor*
U.S. Bankruptcy Court, Eastern District of California

 Municipal bankruptcy suit

 Testimony regarding economic theory, labor economics, and econometrics

 Retained by the City of Stockton

 Deposed on March 13, 2013

 Report filed on February 15, 2013

*In the Matter of Act 111 Interest Arbitration Between Commonwealth of Pennsylvania and Pennsylvania State Troopers Association*

 Hearings on wage setting

 Testimony regarding rare risks and the value of a statistical life

 Retained by the Pennsylvania State Troopers Association

 Testimony given on December 4, 2012

 Report filed on December 4, 2012

*CV for Justin McCrary*

**APPENDIX A** 8

## Scholarship on Sampling, Statistics, and Econometrics

Conservative Tests Under Satisficing Models of Publication Bias (with Garret Christensen and Daniele Fanelli)
*PLOS One*, Volume 11, Number 2, February 22, 2016

New Evidence on the Finite Sample Properties of Propensity Score Matching and Reweighting Estimators (with Matias Busso and John DiNardo)
*Review of Economics and Statistics*, Volume 96, Number 5, December 2014

Incomes in South Africa Since the Fall of Apartheid (with Murray Leibbrandt and James Levinsohn)
*Journal of Globalization and Development*, Volume 1, Issue 1, January 2010

Manipulation of the Running Variable in the Regression Discontinuity Design: A Density Test
*Journal of Econometrics*, Volume 142 , Issue 2, February 2008

## Scholarship on Risk and Crime

Are U.S. Cities Underpoliced? Theory and Evidence (with Aaron Chalfin)
*Review of Economics and Statistics*, Volume 100, Issue 1, March 2018, 167–186

Criminal Deterrence: A Review of the Literature (with Aaron Chalfin)
*Journal of Economic Literature*, Volume 55, Number 1, March 2017, 5–48 (lead article)

The Deterrence Effect of Prison: Dynamic Theory and Evidence (with David S. Lee)
*Advances in Econometrics*, Volume 38, 2017, editors Matias D. Cattaneo and Juan Carlos Escanciano
2018 Emerald Literati Award, Outstanding Author Contribution

Do Sexually Violent Predator Laws Violate Double Jeopardy or Substantive Due Process: An Empirical Inquiry (with Tamara Lave)
*Brooklyn Law Review*, Volume 78, Summer 2013, Number 4, 1391–1439

General Equilibrium Effects of Prison on Crime: Evidence From International Comparisons (with Sarath Sanga)
*Cato Papers on Public Policy*, Volume 2, 2012

*Controlling Crime: Strategies and Tradeoffs* (co-edited with Phil Cook and Jens Ludwig), Chicago: University of Chicago Press, 2011.

## Scholarship on Competition

Measuring Benchmark Damages in Antitrust Litigation (with Daniel L. Rubinfeld)
*Journal of Econometric Methods*, Volume 3, January 2014

## Scholarship on Finance

Dark Trading at the Midpoint: Pricing Rules, Order Flow, and Price Discovery (with Robert Bartlett)
Accepted, *Journal of Law, Finance, and Accounting*

How Rigged Are Stock Markets?: Evidence from Microsecond Timestamps (working paper, 2016, with Robert Bartlett)

Shall We Haggle in Pennies at the Speed of Light or in Nickels in the Dark?: How Minimum Price Variation Regulates High Frequency Trading and Dark Liquidity (working paper, 2015, with Robert Bartlett)

## Scholarship on Labor Economics

Unmarked? Criminal Record Clearing and Employment Outcomes (with Jeffrey Selbin (lead author) and Joshua Epstein)
>*Journal of Criminal Law and Criminology*, Volume 108, Number 1, 2017 (lead article)

The Effect of Female Education on Fertility and Infant Health: Evidence from School Entry Laws Using Exact Date of Birth (with Heather Royer)
>*American Economic Review*, Volume 101, Number 1, February 2011

Comment on "Free to Punish? The American Dream and the Harsh Treatment of Criminals", by Rafael di Tella and Juan Dubra
>*Cato Papers on Public Policy*, Volume 1, 2011

Dynamic Perspectives on Crime
>in *Handbook of the Economics of Crime*, Chapter 4, Edward Elgar, 2010

The Effect of Court-Ordered Hiring Quotas on the Composition and Quality of Police
>*American Economic Review*, Volume 97, Number 1, March 2007

Using Electoral Cycles in Police Hiring to Estimate the Effect of Police on Crime: Comment
>*American Economic Review*, Volume 92, Number 4, September 2002

## Other Scholarship

The Ph.D. Rises in American Law Schools, 1960-2011: What Does It Mean for Legal Education? (with Joy Milligan and James Phillips)
>*Journal of Legal Education*, Volume 65, Number 543, Spring 2016

Following Germany's Lead: Using International Monetary Linkages to Estimate the Effect of Monetary Policy on the Economy (with Julian di Giovanni and Till von Wachter)
>*Review of Economics and Statistics*, Volume 91, Number 2, May 2009

## Other Activities

2017–    Member, Board of Directors, American Law and Economics Association

2007–    Co-Director (with Phil Cook and Jens Ludwig), *Crime Working Group*, National Bureau of Economic Research

2009–2014 Co-Director, *Law and Economics Program*, University of California, Berkeley

## Courses Taught

### Columbia

2018-2019 L6916: Litigation, Economics, and Statistics (Fall); L6231: Corporations (Spring)

2017-2018 L6231: Corporations (Fall)

### Berkeley

2016-2017 Law 244.4: Litigation and Statistics (Fall); Law 216: Law and Economics Workshop (Fall); Law 218.6: Law and Economics of Discrimination (Fall)

2015-2016 Law 250: Business Associations (Fall); Law 244.4: Litigation and Statistics (Fall); Letters and Science 39D: Race, Policing, and Data Science (Fall)

2014-2015 Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer)

*CV for Justin McCrary*                                    **APPENDIX A** 10

2013-2014 Law 250S: Business Associations (Summer)

2012-2013 Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 209.3: Introductory Statistics (Fall)

2011-2012 Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 209.3: Introductory Statistics (Fall); Law 251.31: Introduction to Law, Economics, and Business (Spring); Legal Studies 145: Law and Economics I (undergraduate)

2010-2011 Law 250: Business Associations (Fall); Law 250S: Business Associations (Summer); Law 216: Law and Economics Workshop (Fall and Spring); Legal Studies 145: Law and Economics I (undergraduate); Law 209.6: Topic in Quantitative Methods (JSP); Econ 250C: Labor Economics (graduate, shared course with 209.6)

2009–2010 Law 216: Law and Economics Workshop (Fall and Spring); Law 209.32: Quantitative Methods II (JSP)

2008–2009 Legal Studies 145: Law and Economics I (undergraduate); Law 209.3: Quantitative Methods I (JSP); Law 209.32: Quantitative Methods II (JSP)

2007–2008 Legal Studies 145: Law and Economics I (undergraduate); Law 209.3: Quantitative Methods I (JSP)

*Michigan*

Introduction to Quantitative Methods (policy), First Econometrics Field Course (economics), Advanced Economic Theory (policy)

## Grants and Fellowships

2007–2010 NIH, Constructive Proposals for Dealing With Attrition (with John DiNardo)

2009 Committee on Research, Junior Faculty Research Grant, UC Berkeley

2006–2009 NIH, The Effect of Female Education on Fertility and Infant Health (with Heather Royer, Grant # R03 HD051713)

2006–2011 NSF, New Instrumental Variables Estimates of the Effects of Schooling and Military Service: Empirical Strategies Using Non-Public-Use Data (with Josh Angrist and Stacey Chen)

2005 RWJ Foundation Health and Society Scholars Program, Small Grant Program

2004 Rackham Interdisciplinary Grant, University of Michigan

2004 CLOSUP Grant, University of Michigan

2004 National Poverty Center Grant, University of Michigan

2002–2003 Chancellor's Dissertation Year Fellowship, UC Berkeley

## Presentations

2018–2019 Columbia University, School of Law; Conference on Empirical Legal Studies, University of Michigan

2017–2018 Columbia University, School of Law; Georgetown University, School of Law

2016–2017 George Mason University, School of Law; University of Michigan, Economics Department (Summer, Fall); Equities Leaders Summit; University of Zürich, Department of Economics; ETH (Swiss Federal Institute of Technology) Zürich, Law and Economics; Northwestern University, School of Law; Duke University, School of Law; Duke University, Information Initiative

2015–2016 Goldman Sachs; University of California, Berkeley, School of Law; University of Virginia, School of Law; University of California, Irvine; Equal Employment Opportunity Commission; National Bureau of Economic Research, Summer Institute

2014–2015  Duke University; Federal Reserve Bank of New York; Equal Employment Opportunity Commission (EEO-DataNet); American Law and Economics Association (discussant); New York University (NYU / Penn Law and Finance Conference); National Bureau of Economic Research, Summer Institute (discussant)

2013–2014  University of Southern California, School of Law; London School of Economics; Bank of Spain; CEMFI; Carlos III; University of Zaragoza; University of Rotterdam; University of Maastricht; University of Götenborg

2012–2013  University of California, Los Angeles, School of Law

2011–2012  University of Oregon, Department of Economics; University of British Columbia, Department of Economics; Brown University, Department of Economics; University of Rochester, Department of Economics; Cato Institute; National Bureau of Economic Research, Summer Institute; Harvard Law School

2010–2011  Northwestern, School of Law; University of Wisconsin, Department of Economics; Brookings Institution; Cato Institute

2009–2010  University of Chicago, School of Law; Cornell University, School of Law and Department of Economics; University of Michigan, School of Law and Department of Economics; University of Virginia, School of Law, Olin Conference

2008–2009  University of California, Los Angeles, School of Law; University of Arizona, School of Law and Department of Economics; Stanford University, School of Law and Department of Economics; University of Miami, Department of Economics

2007–2008  Northwestern University, School of Law; University of Michigan, Department of Economics; National Bureau of Economic Research, Summer Institute; Florida State University

*Prior to 2007–2008, presentations are at departments of economics, unless otherwise noted*

2006–2007  University of Michigan, Program in Survey Methodology; Public Policy Institute of California; Brown University

2005–2006  University of Michigan; University of California, Irvine; University of California, Santa Barbara; University of California, Santa Cruz; California State University, Long Beach; University of Western Ontario; University of Toronto; University of Illinois, Chicago; University of Chicago, Graduate School of Business; APPAM; University of Florida; University of California, Berkeley, School of Law; Princeton University; RAND; Hebrew University (conference in honor of Reuben Gronau); Stanford University, University of Wisconsin, Madison; Northwestern University; Crime and Economics Summer Workshop, University of Maryland

2004–2005  Federal Reserve Bank of Chicago; University of Illinois, Urbana-Champaign; University of Michigan, William Davidson Institute; University of Maryland; Urban Institute; American Economics Association Meetings; City University of New York Health Economics Seminar; University of Wisconsin, Madison; Stanford University; University of California, Davis; University of California, Berkeley, Labor Lunch; NBER Summer Institute, Education/Labor Studies

2003–2004  University of Michigan; APPAM; NBER Labor Studies Meeting (Fall); Massachusetts Institute of Technology; Harvard University, Kennedy School; University of California, Los Angeles; University of California, San Diego; Columbia University; University of California, Berkeley; NBER Summer Institute, Monetary Policy; NBER Summer Institute, Labor Studies

2002–2003  University of California, San Diego; University of California, Los Angeles; RAND Institute; University of Chicago, Graduate School of Business; University of Chicago, Harris School of Public Policy; University of Michigan, Ford School of Public Policy; Columbia University; Dartmouth College; Federal Reserve Bank of New York; Boston University

**APPENDIX B**

# Documents Relied Upon

## Books

Anderson, David R., Dennis J. Sweeny, and Thomas A. Williams, *Statistics for Business and Economics*, 10th Edition, Thomson South-Western, Mason, OH 2008.

Manski, Charles F., *Identification for Prediction and Decision,* Harvard University Press, Cambridge, MA 2007.

Wackerly, Dennis D., William Mendenhall, and Richard L. Scheaffer, *Mathematical Statistics with Applications*, 7th Edition, Thomson Brooks/Cole, Belmont, CA 2008.

## Expert Reports

Expert Report of Ronald T. Wilcox, May 7, 2018.

Fourth Report of Dr. Jon A. Krosnick, December 5, 2018.

Report of Dr. Jon A. Krosnick, August 28, 2017.

## Publicly Available Documents

Heckman, James J., "What Has Been Learned About Labor Supply in the Past Twenty Years?" *American Economic Review,* 83(2).